# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# JASPER DIVISION

|  |  |  |
|---|---|---|
| TR, a minor, by and through her mother, Porsha Brock, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | 6:19-cv-01101-LSC |
| Lamar County Board of Education, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OF OPINION

Four motions are before the Court:

- Defendants' motion for summary judgment (Doc. 42);

- Plaintiff's motion to strike defendants' summary judgment exhibits (Doc. 44);

- Defendants' motion to strike the affidavit of Alexus Real (Doc. 48); and

- Defendants' motion to strike portions of plaintiff's response brief (Doc. 49).

For the reasons explained below,

- Defendants' motion for summary judgment (Doc. 42) is due to be granted;

- Plaintiff's motion to strike defendants' summary judgment exhibits (Doc. 44) is due to be denied;

- Defendants' motion to strike the affidavit of Alexus Real (Doc. 48) is due to be terminated as moot; and

- Defendants' motion to strike portions of plaintiff's response brief (Doc. 49) is due to be denied.

## I.   Background

Viewed in the light most favorable to the plaintiff, the facts are as follows.[1]

### A.

A teacher at Sulligent High School in Lamar County, Alabama smelled marijuana burning in his classroom. He alerted school administration, and two administrators, Principal Lisa Stamps and Assistant Principal Matthew Byars, searched the belongings of every student in the class. They found drugs and drug paraphernalia in only one place: a backpack belonging to a fourteen-year-old female student named TR.

In TR's backpack the administrators found marijuana stems, marijuana seeds, rolling paper, two lighters, and an assortment of pills, none of which were in prescription bottles. They did not, however, find any marijuana.

---

[1] The Court gleans these "facts" from the parties' submissions of facts claimed to be undisputed, the parties' responses to those submissions, and the Court's independent examination of the record. These are the "facts" for summary judgment purposes only. *See Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994). Their inclusion in this Memorandum of Opinion does not signal their veracity.

Suspecting TR of harboring marijuana, administrators escorted her to the school counselor's office and opened an investigation. Principal Stamps asked B.J. Moore, Sulligent's school nurse, to identify the out-of-bottle pills found in TR's backpack. Nurse Moore examined the pills and determined that TR held a valid prescription for some of them; the rest were an over-the-counter detox medication used to "flush out" a person's system before a drug test.

Principal Stamps then spoke with two students from TR's class. Both gave similar accounts of what happened. Both claimed they saw TR light a marijuana cigarette in class and then spray perfume to mask the odor.

After meeting with the nurse and the two student witnesses, Principal Stamps questioned TR about her drug habits and, more specifically, about smoking marijuana in class earlier that day. TR admitted to having a drug problem, to having smoked marijuana since she was eleven years old, and to regularly using her snack money to purchase illegal drugs. But she denied smoking marijuana in class and denied having additional drugs or drug paraphernalia on her person.

**B.**

The parties heavily dispute what happened next. According to TR, Sulligent administrators strip searched her twice, both times to the point of full nudity and both times without success. The first alleged search took place in a room with only

Principal Stamps and Counselor Dean. TR contends the two administrators asked her to remove her clothing, lift her breasts, and bend over for an inspection. She complied. This first search revealed neither drugs nor drug paraphernalia.

TR's mother and sister then arrived and walked into Counselor Dean's office. They found TR still there, sitting in her bra and boxers. Principal Stamps and Counselor Dean spoke with TR's mother and sister and then allegedly directed TR to again remove her clothing. She removed her bra and boxers, bent over, and once again submitted to an inspection.

TR believes the two searches were especially intrusive for two reasons. For one she was on her menstrual cycle. She says this added to the invasiveness and made her feel "humiliated and embarrassed and gross." (Doc. 43-1 at 128.) Second, Counselor Dean's office—the office where the alleged strip searches took place— has a window, and TR testified this window remained uncovered during the first search. TR's sister covered it before the second. No evidence suggests a student or school official ever (1) peered through the window or (2) otherwise observed TR's nakedness.

## C.

Acting by and through her mother, Porsha Brock, TR filed a five-count complaint in this Court. Count I is a Fourth-Amendment unreasonable-search claim,

brought under 42 U.S.C. § 1983, against Principal Stamps, Counselor Dean, and Superintendent Vance Harron. Count II is a § 1983 failure-to-train claim against Superintendent Harron and the Lamar County Board of Education. Count III is a state-law assault claim against Principal Stamps and Counselor Dean.[2] Count IV is a state-law invasion-of-privacy claim against Principal Stamps and Counselor Dean. And Count V is a state-law claim for intentional infliction of emotional distress (or outrage) against Principal Stamps, Counselor Dean, Superintendent Harron, and the Lamar County Board of Education.

## II.  Motion for Summary Judgment.

The defendants moved for summary judgment on each of TR's claims. A successful summary judgment motion shows there is no genuine dispute as to any material fact and that the plaintiff deserves judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists, and summary judgment is not appropriate, if "the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Tellecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)).

---

[2]     TR concedes summary judgment is due to be granted as to her assault claim. (Doc. 46 at 25.) The Court acknowledges her concession and will dismiss Count III in an accompanying Order.

At summary judgment, district courts view all evidence and draw all justifiable inferences in the nonmoving party's favor. *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1383 (11th Cir. 1990). Then we determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be . . . resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 250–51 (1986). The Court will address each claim in turn.

## A.

The defendants first moved for summary judgment on TR's Fourth Amendment unreasonable-search claim. After careful consideration of the briefs and cited authority, summary judgment is due to be granted. Even if the defendants unreasonably searched TR those searches did not violate clearly established law. Principal Stamps, Counselor Dean, and Superintendent Harron are therefore entitled to qualified immunity.

Qualified immunity shields state and federal officials from civil liability unless a plaintiff shows two things: "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Courts can "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis" they address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Here the

Court's inquiry begins and ends with prong two, the "clearly established" prong. Beginning here comports with courts' "usual reluctance to decide constitutional questions unnecessarily." *Reichle v. Howards*, 566 U.S. 658, 664 (2012)

A right becomes clearly established when the contours of the rights are so clear "a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Typically, this means existing precedent must be "clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *D.C. v. Wesby*, 138 S.Ct. 577, 590 (2018) (citation omitted). This exacting standard "protects all but the plainly incompetent or those who knowingly violate the law." *Jordan v. Mosley*, 487 F.3d 1350, 1354 (11th Cir. 2007) (citation omitted) (internal quotation marks omitted).

A plaintiff can show a right was clearly established in one of three ways. *Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288, 1291–92 (11th Cir. 2009). First, she can point the Court "to a materially similar case that has already been decided" by the Supreme Court, the Eleventh Circuit Court of Appeals, or the Supreme Court of Alabama. *Echols v. Lawton*, 913 F.3d 1313, 1324 (11th Cir. 2019) (citing *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012)). Second, she can point the Court to "a broader, clearly established principle that should control the novel facts of the

situation." *Id.* Third and finally, "the conduct involved in the case may so obviously violate the Constitution that prior case law is unnecessary." *Id.* TR's claim fails under all three approaches.

## 1.

TR has not identified a "materially similar" precedent placing the defendants on notice that their conduct violated the Fourth Amendment. She relies on four cases, none of which are sufficiently analogous to defeat qualified immunity.

She relies first on *New Jersey v. TLO*, 469 U.S. 325 (1985). In *TLO*, the United States Supreme Court (A) applied the Fourth Amendment's prohibition against unreasonable searches and seizures to searches conducted by public school officials and then (B) articulated the standard by which courts evaluate the reasonableness of those searches. School searches are reasonable, the Court held, when they satisfy a two-part inquiry. *Id.* at 341–42. Inquiry one asks whether the search was "justified at its inception." *Id.* Ordinarily "a search of a student by a teacher or other school official will be justified at its inception when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *Id.* (internal quotations and citations omitted). Inquiry two asks whether the search "was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* It

asks, in other words, whether the search's scope was "reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.*

*TLO* cannot satisfy TR's "clearly established" burden. *See Jenkins v. Talladega City Board of Education*, 115 F.3d 821 (11th Cir. 1997). Although *TLO* provides a general framework for evaluating a search's reasonableness, it gives "no illustration, indication, or hint as to *how* the enumerated factors might come into play when other concrete circumstances are faced by school personnel." *Id.* at 825. The decision offers no guidance as to "whether the search of a younger or older student might be deemed more or less intrusive; whether the search of a boy or girl is more or less reasonable, and at what age or grade level; and what constitutes an infraction great enough to warrant a constitutionally reasonable search or, conversely, minor enough such that a search of property or person would be characterized as unreasonable." *Id.* at 826. So without specific direction from a factually analogous case "no reasonable school official could glean from [*TLO*'s] broadly-worded phrases" whether and when a search violates the Fourth Amendment. *Id.* at 825–26. *TLO* offers a broad rule, not the explicit guidance needed to clearly establish a right.

TR's second precedent, *Safford Unified School District Number 1 v. Redding*, 557 U.S. 364 (2009), is also insufficiently similar to provide fair notice. *Safford*

involved the strip-search of a thirteen-year-old female student suspected of bringing forbidden prescription and over-the-counter drugs to school. *Id.* at 368. Administrators took the student to the school nurse's office, ordered her to remove her clothing, and then asked her to pull out her bra and underpants. *Id.* at 374.

The search in *Safford* was unreasonable for two reasons. First, administrators had no reason to suspect the student had hidden drugs in her undergarments. *Id.* at 376 ("Wilson never even determined when Marissa had received the pills from Savana; if it had been a few days before, that would weigh heavily against any reasonable conclusion that Savana presently had the pills on her person, much less her underwear."). And without *some* circumstantial evidence linking the missing drugs to the student's private areas, administrators had no cause to "make the quantum leap from outer clothes and backpacks to exposure of intimate parts." *Id.* at 377. Second, the drugs at issue—prescription-strength ibuprofen and over-the-counter anti-inflammation pills—were "nondangerous school contraband" posing no immediate threat to school or student safety. *Id.* at 376. Because administrators had no reason to believe the student had hidden drugs in her undergarments and because they had no reason to believe those drugs, even if hidden, were dangerous, "the content of the suspicion failed to match the degree of the intrusion." *Id.* at 375. What was missing "was any indication of danger to the students from the power of

the drugs or their quantity, and any reason to suppose that [the student] was carrying pills in her underwear." *Id.* at 376–77.

The same cannot be said here. Unlike in *Safford*, Principal Stamps and Counselor Dean had *some* reason to suspect TR had hidden illegal drugs on her person. After all, administrators didn't find the marijuana cigarette with the rest of TR's belongings, and, given the close temporal proximity between the policy violation (smoking marijuana in class) and the unsuccessful search of TR's backpack, administrators might have reasonably concluded she hid the missing cigarette in or under her clothing. Furthermore, marijuana is a categorically different and more dangerous drug than the anti-inflammatory medication at issue in *Safford*. *D.H. by Dawson v. Clayton County School District*, 830 F.3d 1306, 1316 n.7 (11th Cir. 2016) ("[T]here is no question that marijuana, a controlled substance, presents a greater danger to school safety than even a 'prescription strength' ibuprofen pill."). "School years are the time when the physical, psychological, and addictive effects of drugs are most severe," *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 661 (1995), and a Schedule-1 drug implicates school officials' "compelling interest" in combatting illegal substances to a greater degree than prescription-grade ibuprofen. Given these two important distinctions—the danger of the drug and the presence of *some* temporal linkage between the missing drugs and TR's person—*Safford* is not a

similar enough precedent to place the unconstitutionality of the defendants' conduct "beyond debate." *Cf. Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) (citation omitted).

TR's third precedent, *Thomas ex rel. Thomas v. Roberts*, 261 F.3d 1160 (11th Cir. 2001), *vacated on other grounds by*, 536 U.S. 953 (2002), *reinstated*, 323 F.3d 950 (11th Cir. 2003), is even less applicable. *Thomas* held "the alleged theft of twenty-six dollars . . . does not represent such an extreme threat to school discipline or safety that children may be subject to intrusive strip searches without individualized suspicion." *Id.* at 1169. This holding is inapposite for two reasons. First: Marijuana poses a greater threat to school discipline and safety than stolen money. Second: The defendants here had individualized suspicion linking TR to the missing marijuana, at least for the first search.[3] The searches at issue here lack two pivotal characteristics that rendered the *Thomas* search unreasonable.

---

[3] Teachers found drugs and drug paraphernalia in TR's bag, two student-witnesses reported seeing TR smoke a marijuana cigarette in class, and searching administrators didn't find the marijuana cigarette in TR's belongings. All this created reasonable and individualized suspicion for the first search. *See United States v. Bruce*, 977 F.3d 1112, 1116 (11th Cir. 2020) (quoting *Navarette v. Cal.*, 572 U.S. 393, 397 (2014)) ("Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause."). Even if the defendants lacked reasonable, individualized suspicion for the second search—a question this Court needn't answer—the dangerousness of the suspected drug—a Schedule 1 substance—is significant enough on its own to distinguish this case from *Thomas*.

The most analogous precedent is *D.H. by Dawson v. Clayton County School District*. 830 F.3d 1306 (11th Cir. 2016). In *D.H.*, school administrators suspected a 7th-grade boy of hiding marijuana in his underwear. *Id.* at 1308. But instead of taking the boy to a private location and searching him there, administrators strip searched him in front of three classmates. *Id.* at 1311.

Despite the similarities—the same drug, the similarly aged plaintiffs, etc.—no reasonable school official would read *D.H.* as prohibiting the searches at issue here. *D.H.* held unreasonable only one type of search: one where an official requires a student "to strip down to his full naked body in front of several of his peers." *Id.* at 1318. The opinion repeatedly references the unique indignity a child suffers when he or she is forced to strip naked in front of classmates.

> The problem, of course, is that McDowell's arbitrary decision to require D.H. to completely remove his underwear **in front of his peers** unnecessarily subjected D.H. to a significantly higher level of intrusion. We have no doubt that a fully nude strip search **in the presence of one's peers** would exponentially intensify the embarrassment, fright, and humiliation a student experiences when undergoing a strip search. . . . In fact, the elevated sense of intrusion was made apparent by D.H. when he asked that the search be conducted in the bathroom so that he was not forced to expose his genitals **in front of his peers**.

> Simply put, while McDowell's decision to strip search D.H. was justified at its inception, his decision to force D.H. to stand fully nude **in front of his peers** made the search excessive in scope. There was no exigency that prevented McDowell from asking D.H. to pull his waistband away from his body, from taking D.H. to a private place, or from excusing the other students to an area outside of his office.

*Id.* (emphasis added) (citations omitted) (internal quotations omitted). Such a search is unreasonably intrusive because it "exponentially intensif[ies] the embarrassment, fright, and humiliation" of the search without any corresponding benefit to school or student safety. *Id.*

Unlike in *D.H.*, no administrator forced TR to strip naked "in front of her peers" and classmates. She was alone with two female administrators for the first search, and her mother and sister joined for the second. Even if stripping in front of one's mother and sister is as embarrassing, frightening, and humiliating as stripping in front of one's peers (an unlikely proposition), "public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases." *Jones v. City of Dothan, Ala.*, 121 F.3d 1456, 1460 (11th Cir. 1997) (citation omitted) (internal quotation marks omitted). Principal Stamps, Counselor Dean, and Superintendent Harron were not obligated to extrapolate *D.H.*'s reasoning and apply it to an inapposite set of circumstances.

TR advances a counterargument: the window in Counselor Dean's office. Because this window remained uncovered during the first strip search, peers and unnecessary school officials "could have" peered in and "could have" seen TR's nakedness. (Doc. 46 at 16–17.) This possibility, however remote, "could have exponentially intensified the humiliation that TR experienced." (*Id.*)

TR's counterargument is too speculative to defeat qualified immunity. No record evidence suggests a single student or official peered through Counselor Dean's window and observed TR while naked. And without *some* evidence that peers witnessed the search, the Court lacks a factual basis to say TR faced the level of humiliation and intrusiveness at issue in *D.H.*

**2.**

Just as no case with materially similar facts applies, no "broader, clearly established principle" placed the defendants on notice that their conduct violated the Fourth Amendment. TR argues the following: "Defendant Stamps and Dean violated clearly established law by searching a student without any reason to believe [she] was hiding contraband under her clothes and during the second strip-search having no reasonable suspicion to search T.R. at all." (Doc. 46 at 19.) This "broad principle" is far too broad to defeat qualified immunity.

The Supreme Court "has repeatedly told courts . . . not to define clearly established law at a high level of generality." *Kisela*, 138 S.Ct. at 1152 (citations and internal quotation marks omitted). Specificity "is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an [official] to determine how the relevant legal doctrine" applies to the factual situations the official confronts. *Id.* (citing *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).

TR's proposed rule—that, as a matter of law, a school official violates clearly established constitutional rights when he or she searches a student without reasonable suspicion—does little more than restate *TLO*'s holding. It offers no *specific* guidance to school officials, so it falls far short of establishing law "with obvious clarity to the point that every objectively reasonable government official facing the circumstances" would know what violates federal law. *See Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002). TR has not pointed the Court to a principle of law covering the novel facts presented here and, accordingly, has not satisfied the second method by which a plaintiff can overcome qualified immunity.[4]

**3.**

Nor, finally, does this matter fall within the narrow class of cases where an official "so obviously violate[d] the Constitution that prior case law is unnecessary" to establish a clear constitutional violation. *Loftus*, 690 F.3d at 1205. Although in

---

[4]     TR's response brief implies a second "broad proposition"—that an official violates clearly established law when he or she searches a student without individualized suspicion. (Doc. 46 at 19) ("Defendant Stamps and Dean violated clearly established law by searching a student without any reason to believe [she] was hiding contraband under her clothes and during the second strip-search having no individualized reasonable suspicion to search [her] at all."). Again, this proposition is far too broad to defeat qualified immunity. When does an official have reasonable suspicion? Or individualized suspicion? These are difficult questions, especially without the guidance of a factually analogous case. Defining a right at such a high level of generality would provide little-to-no guidance to school officials performing their important "custodial and tutelary responsibilit[ies] for children." *Vernonia*, 515 U.S. at 656.

"extreme factual circumstances" a plaintiff can show a clearly established right without on-point precedent, *Cantu v. City of Dothan, Ala.*, 974 F.3d 1217, 1232 (11th Cir. 2020), these circumstances are few and far between. *See Coffin v. Brandau*, 642 F.3d 999, 1015 (11th Cir. 2011) ("Our case law has made clear that 'obvious clarity' cases will be rare."). Even if the searches alleged by TR rise to a constitutional violation, they are not "so far beyond the hazy border between excessive and acceptable [conduct] that [the defendants] had to know [they were] violating the Constitution even without caselaw on point." *Cantu*, 974 F.3d at 1232–33. So the third and final method by which a plaintiff can show a clearly established right does not apply.

Having determined the defendants didn't violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known," *see Lassiter v. Ala. A&M Univ., Bd. of Trs.*, 28 F.3d 1146, 1149 (11th Cir. 1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)), the Court needn't decide whether TR's allegations amount to a Fourth Amendment violation. The Supreme Court has cautioned courts against "expending scarce judicial resources to resolve difficult and novel questions of constitutional or statutory interpretation that will have no effect on the outcome of the case," *Ashcroft*, 563 U.S. 735 (internal quotation

marks omitted), and no Fourth Amendment analysis would alter the outcome here. Summary judgment on TR's Fourth Amendment claim is due to be granted.

## B.

The defendants next moved for summary judgment on TR's failure-to-train claim, also brought under 42 U.S.C. § 1983. This claim accuses the Lamar County Board of Education and Superintendent Vance Harron of failing to train Sulligent High School officials "on the proper protocol and procedures for conducting personal strip searches of students." (Doc. 46 at 20–21.)

Municipalities and local governments face § 1983 liability only if the government itself, and not the government's employees, "subjects" a person or "causes" a person "to be subjected" to a deprivation of federal rights.[5] *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). "[I]n other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.*

To distinguish municipal liability from *respondeat superior* liability, courts determine if the local government's official policy was the "moving force" behind the plaintiff's alleged deprivation. *Vineyard v. Cnty. of Murray, Ga.*, 990 F.2d 1207, 1211 (11th Cir. 1993) (citing *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981)). If yes,

---

[5]     For purposes of § 1983, Alabama's county school boards and school board officials sued in their official capacities are treated as local governmental entities. *Cf. Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1290 (11th Cir. 2004)

then the local government's "*own* illegal acts"—not the illegal acts of its employees—caused the plaintiff's alleged injury. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). Official policy might arise from a written policy, from enacted legislation, or from the decisions or actions of whichever "particular official has final policymaking authority" in an area of local government. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123–27 (1988).

"In limited circumstances, a local government's decision not to train certain employees . . . to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). These circumstances are indeed limited; "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* To face liability the local government must have been deliberately indifferent to the need for training. After all, "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989) (internal quotation marks omitted).

To demonstrate deliberate indifference a plaintiff must show the government "knew that a need to train or supervise its employees existed but made a deliberate

choice not to take any action." *Thomas*, 261 F.3d at 1173. A plaintiff can shoulder this burden in one of two ways. She can show "a pattern of constitutional violations exists such that the municipality [knew] or should [have known] that corrective measures [were] needed." *Gold v. City of Miami*, 151 F.3d 1346, 1352 n.12 (11th Cir. 1998) (quoting *Young v. City of Augusta, Ga.*, 59 F.3d 1160, 1172 (11th Cir. 1998)). She alternatively can show the need for additional training was obvious, even without a pattern of constitutional violations, because the government's untrained employees "face clear constitutional duties in recurrent situations." *Id.*

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitation on the use of deadly force, see *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct 1694, 85 L.Ed. 2d 1 (1985), can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*City of Canton*, 489 U.S. at 390 n.10.

TR's claim fails under both approaches. Even if the Lamar County Board of Education and Superintendent Stamps failed to train school officials about Fourth Amendment requirements and proper search techniques, those failures did not rise to deliberate indifference.

First, TR hasn't shown a pattern of similar constitutional violations within the Lamar County school system. Other than the two searches alleged by TR, the Court

has not been provided evidence of any drug-related searches at any Lamar County public school—not one. And because a "single incident of a constitutional violation is insufficient to prove a policy or custom" of unconstitutional conduct, *see Craig v. Floyd Cnty., Ga.*, 643 F.3d 1306, 1311 (11th Cir. 2011), the searches of TR cannot, on their own, show the deliberate indifference necessary for a failure-to-train claim.

Second, no evidence suggests Lamar County Board of Education personnel recurrently face situations so similar to this one "that the need for training would be obvious" even without a pattern of misconduct. All available evidence suggests just the opposite—that student searches in Lamar County are quite rare. Consider the following excerpt from Principal Stamps's affidavit:

> While I was principal at SHS, I had not faced recurrent situations like the one faced here after a female student was found with drugs and drug paraphernalia in her backpack and I handled the investigation. It is very rare for students to smoke marijuana in an occupied classroom during class. Sulligent High School did not recurrently find students with drugs and recurrently search students.

(Doc. 43-3 at 5–6.) Given (A) Principal Stamps's affidavit and (B) the lack of counterevidence from TR, the Court has no basis to conclude the likelihood of "constitutional violations [by Sulligent High School employees] was highly predictable so that liability attaches for this single incident." *Gold*, 151 F.3d at 1352.[6]

---

[6]     The Eleventh Circuit reached the same conclusion in *Thomas*. 261 F.3d 1160 (11th Cir. 2001). Along with Fourth Amendment claims against the individual school officials, the *Thomas* plaintiffs brought a failure-to-train claim against the school district, arguing it "should be held

TR disagrees. She argues that "[f]aculty at Sulligent High School . . . opted to utilize procedures that were antithetical to the policy codified in the Lamar County Board of Education policy manual." (Doc. 46 at 21.) She believes this single deviation from school policy is enough evidence of inadequate training to create a question of fact on her failure-to-train claim.

Principal Stamps and Counselor Dean may well have violated the Lamar County School District's student-search policy. District policy requires school officials to receive the "specific approval of the Superintendent" before conducting any search "more thorough" than a "private pat down of [a] student" or a search of a student's "personal items and clothing." (Doc. 46-5 at 5.) And, according to Superintendent Harron, neither Principal Stamps nor Counselor Dean sought his approval before searching TR (Doc. 43-5 at 2).[7]

---

responsible because it failed to adequately train its employees on the constitutional limits of student searches." *Id.* at 1172. The Eleventh Circuit declined to hold the school district liable under a recurrent-constitutional-duties theory because, like here, "the students . . . failed to demonstrate that District personnel [were] recurrently faced with situations which [were] so similar to the facts of the instant case that the need for training would be obvious." *Id.* at 1174. There, like here, "the record [was] bereft of evidence as to whether District officials [had] ever conducted" similar searches or faced similar constitutional questions. *Id.*

[7]     Superintendent Harron's affidavit provides: "On the afternoon of August 28, 2017, I was contacted by Dr. Lisa Stamps concerning the discovery of drugs and drug paraphernalia in a student's backpack and that an investigation was being conducted by administrators. However, I knew nothing of how the administrators were conducting the investigation. I was not asked if TR could be strip searched as part of any investigation. Nor did I give permission to any administrator to search TR." (Doc. 43-5 at 2.)

But even if Principal Stamps deviated from district policy by not seeking and receiving Harron's approval, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*." *City of Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985). Without a pattern of similar misconduct and with no showing of obviousness, no reasonable jury could find the defendants acted with deliberate indifference.

## C.

Principal Stamps and Counselor Dean next moved for summary judgment on TR's invasion-of-privacy claim.[8] Both claim the protection of Alabama's state-agent-immunity.

Alabama's "[s]tate-agent immunity protects state employees, as agents of the State, in the exercise of their judgment in executing their work responsibilities." *Ex parte Hayles*, 852 So. 2d 117, 122 (Ala. 2002). In *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000), Alabama's Supreme Court restated the test for state-agent immunity. Under *Cranman*'s burden-shifting framework "[a] defendant initially bears the burden of demonstrating that he was acting in a function that would entitle him to

---

[8]     This Court's authority to hear TR's state-law claims arises under its supplemental jurisdiction. *See* 28 U.S.C. § 1364. And when, like here, a federal court exercises supplemental jurisdiction over state-law causes of action it must apply the substantive law of the forum state. *See Palm Beach Golf Center-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1259–60 (11th Cir. 2015). Here the forum state is Alabama. Alabama's substantive law will therefore determine the success or failure of TR's state-law invasion-of-privacy and outrage claims.

immunity." *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1255 (11th Cir. 2010) (citing *Ex parte Est. of Reynolds*, 946 So. 2d 450, 452 (Ala. 2006)). "If the State agent makes such a showing, the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority." *Id.*

Principal Stamps and Counselor Dean satisfied their initial burden of showing they qualify for state-agent immunity. As relevant here, a state agent qualifies for immunity when "the conduct made the basis of the claim against the agent is based on the agent's . . . exercising judgment . . . in educating students." *Ex parte Cranman*, 792 So. 2d at 405. The basis of TR's claim—that Principal Stamps and Counselor Dean unreasonably searched her while investigating the presence of illegal drugs on school grounds—involves both the exercising of judgment and the educating of students. "A proper educational environment requires close supervision of school children," *Vernonia*, 515 U.S. at 655, and "close supervision" requires safe and drug-free classrooms.

Because investigating the presence of illegal drugs on school grounds is a function for which public-school administrators ordinarily receive immunity, the burden shifts to TR; to survive summary judgment she must show Principal Stamps and Counselor Dean acted "willfully, maliciously, fraudulently, in bad faith, beyond

[their] authority, or under a mistaken interpretation of the law." *Ex parte Cranman*, 792 So. 2d at 405. TR relies on the "beyond their authority" exception, arguing that Principal Stamps and Counselor Dean violated district policy by performing a strip search without the superintendent's approval. And by violating district policy they acted "beyond their authority" and outside the protections of state-agent immunity. (Doc. 46 at 29.)

Alabama's Supreme Court rejected a similar argument in *Ex parte Brown*, 182 So. 3d 495 (Ala. 2015). There, a plaintiff argued a police officer acted beyond his authority (and therefore beyond the scope of state-agent immunity) by not complying with his department's vehicle-pursuit policy. *Id.* at 504. The Court disagreed, reasoning that a breached policy doesn't necessarily disqualify officials from state-agent immunity. *Id.* at 505–507.

Under *Cranman* and *Brown*, the proper question is whether an official breached "guidelines"—broad rules allowing for some discretion—or "detailed rules and regulation, such as those stated on a checklist." *Id.* at 506. "A State agent acts beyond authority and is therefore not immune when he or she fails to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist." *Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala. 2003). But if an official exercises

discretion and breaches broad guidelines in the process, then he or she remains immune from civil liability.

Lamar County Board of Education's student-search policies are broad guidelines, not "detailed rules and regulations" similar to a checklist. The policy at issue provides:

> *Personal Searches* — Students may be searched whenever reasonable suspicion exists that the student possesses prohibited materials, illegal substances, weapons, or other items that are reasonably deemed to present a risk or threat to the safety and welfare of the school community. Student searches must be conducted by a school administrator in the presence of another certified school employee and may include a private pat down of the student, a search of personal items and clothing, or a more thorough search upon specific approval of the Superintendent. Personal searches will be conducted with due regard for the age and gender of the student. Searches that require physical contact between the school official and the student, removal of clothing, or examination of the student in a way that would implicate privacy concerns must be conducted and witnessed by officials of the same gender as the student and in a way that preserves the dignity of the student to the extent practicable under the circumstances. Refusal to submit to a search or to cooperate in a search as provided in this policy may be grounds for disciplinary action.

This language leaves much to discretion. What is "a more thorough search?" Is a pat down (which requires physical contact) more or less thorough than the searches at issue here (where no official touched TR)? What is "due regard for the age and gender of the student?" And how does one "preserve[] the dignity of the student to the extent practicable under the circumstances?" Unlike detailed rules

and regulations, these broad standards leave room for discretion and judgment calls. The district's search policy is therefore closer to a guideline than a detailed checklist. Even if Principal Stamps and Counselor Dean violated those guidelines, such a violation does not affect their state-agent immunity.

The Court finds that Principal Stamps and Counselor Dean are immune from TR's invasion-of-privacy claim. Summary judgment is due to be granted.

## D.

Finally, the defendants moved for summary judgment on TR's claim for intentional infliction of emotional distress, commonly referred to as "outrage." *Cf. Horne v. TGM Assocs., L.P.*, 56 So. 3d 615, 621 (Ala. 2010). The tort of outrage has three elements: the defendant acted intentionally or recklessly; her conduct was extreme and outrageous; and her conduct caused emotional distress "so severe that no reasonable person could be expected to endure it." *Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000) (quoting *Green Tree Acceptance, Inc. v. Standridge*, 565 So. 2d 38, 44 (Ala. 1990)).

The problem here is element two—the "extreme and outrageous" conduct requirement. By "extreme" misconduct the Alabama Supreme Court means "conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable

in a civilized society." *Jenkins v. U.S. Fidelity & Guar. Co.*, 698 So. 2d 765, 768 (Ala. 1997). This is a heavy burden; to the Court's knowledge, the Supreme Court of Alabama has found sufficiently extreme conduct in on only three instances: "(1) wrongful conduct in the family-burial context; (2) barbaric methods employed to coerce an insurance settlement; and (3) egregious sexual harassment." *Wilson v. Univ. of Ala. Health Servs. Found., P.C.*, 266 So. 3d 674, 677 (Ala. 2017) (quoting Potts, 117 So. 2d at 465).

The allegations here fall well short of conduct outrageous or extreme enough to create a question of fact. TR claims the defendants unreasonably searched her after finding evidence of a Schedule-1 drug in her backpack. She doesn't claim they touched her, groped her, or otherwise abused her physically or sexually, and no evidence suggests they acted maliciously or with the intent to harm. Even if unreasonable, the defendants' conduct didn't go "beyond all possible bounds of decency," nor was it "atrocious and utterly intolerable in a civilized society." TR's outrage claim thus cannot survive summary judgment. *Little v. Robinson*, 72 So. 3d 1168, 1172 (Ala. 2011) (citation omitted) (explaining how "[t]he tort of outrage is an extremely limited cause of action").

### III. First Motion to Strike (Doc. 44)

TR moved to strike six affidavits attached to the defendants' motion for summary judgment. Her motion advances two arguments: (1) that the affidavits "were not disclosed" before summary judgment, and (2) that the affidavits "contain[] inadmissible hearsay." This motion to strike is due to be denied. Federal rules permit summary-judgment movants to support their motions with "affidavits or declarations," Fed. R. Civ. P. 56(c)(4), and the Court finds nothing inappropriate or impermissible about the six disputed affidavits.

### IV. Second Motion to Strike (Doc. 49)

The defendants moved to strike portions of TR's response brief for not complying with the Court's Uniform Initial Order. This motion is likewise due to be denied. While TR's brief may have deviated from the Uniform Initial Order, striking portions of a litigant's response brief is a significant penalty. The Court finds no good cause to apply that penalty here.

### V. Third Motion to Strike (Doc. 48)

The defendants also moved to strike an affidavit submitted by TR's sister, Alexus Real. But because this memorandum neither relies on nor references the disputed affidavit, the Court will terminate this motion as moot.

### VI. Conclusion

The Court will enter an Order consistent with this Memorandum of Opinion.

**DONE** and **ORDERED** on June 22, 2021.

_____
L. Scott Coogler
United States District Judge

203323